IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JASON SHEPHERD

CRIMINAL CASE NO.
1:11-cr-00058-ODE-RGV-1

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Final Report and Recommendation of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b).  Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order.  Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 22nd day of August, 2011.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JASON SHEPHERD

CRIMINAL CASE NO.

1:11-cr-00058-ODE-RGV-1

**MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Jason Shepherd ("Shepherd") is charged in an eight-count indictment with five counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); and one count of theft of government property, in violation of 18 U.S.C. §§ 641 and 2. [Doc. 1 at 1-6].  Shepherd has filed a motion to suppress statements he made in response to allegedly unlawful interrogation by law enforcement agents on November 3, 2009.  [Doc. 15].  Following an evidentiary hearing, the parties have briefed the issues raised by the motion, see [Docs. 27 & 30], and the matter is now ready for ruling.[1]  For the following reasons, the undersigned Magistrate Judge

---

[1] See [Doc. 21] for a transcript of the April 19, 2011, evidentiary hearing.  In addition, the parties submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. ___)," for the government's exhibits, and "(Def. Ex. ___)" for Shepherd's exhibits.

**RECOMMENDS** that Shepherd's motion to suppress statements, [Doc. 15], be **DENIED.**

## I. STATEMENT OF FACTS

Special Agent Andrew Helmers ("Agent Helmers") of the Treasury Inspector General for Tax Administration ("TIGTA")[2] was the agent in charge of an investigation regarding thefts of tax payments from a Bank of America IRS lockbox facility[3] in which Shepherd was a suspect.  See (Tr. at 5-6).  On November 3, 2009, Agent Helmers and Special Agent Janice Scott ("Agent Scott"), also of TIGTA,[4]

---

[2] Agent Helmers testified that he has been a TIGTA Special Agent for three years and that he previously was a revenue agent for the Internal Revenue Service ("IRS").  (Tr. at 4-5).

[3] The IRS lockbox facility is a facility that receives and processes tax payments on behalf of the IRS.  (Tr. at 5).  The lockbox facility in which Shepherd worked occupies half of the ground floor of a multi-level building.  (Tr. at 5-6).  Within the facility is a processing area, which is access-restricted and monitored by live-feed surveillance cameras, and an administrative area, from which the surveillance cameras can be viewed.  (Tr. at 6-7, 35-36).  Upon entry to the secure processing area, employees are subject to surveillance and random searches by security.  (Tr. at 35).  Shepherd was not an IRS or Bank of America employee, but worked for a staffing agency called Staff Mark as a contract employee assigned to the lockbox facility.  (Tr. at 38, 63, 65).

[4] Agent Scott testified that she had been a special agent with TIGTA for 21 years during which time she was assigned to investigations of employee and non-employee administrative and criminal misconduct, including, theft, embezzlement, bribery, impersonation, and assault.  (Tr. at 70-71).  Agent Scott was not the case agent assigned to investigate the case involving Shepherd, but was present to assist Agent Helmers with the interview.  (Tr. at 71).  Agents Scott and Helmers are hereinafter collectively referred to as "the agents."

2

visited the Bank of America lockbox facility in Tucker, Georgia, to conduct three remittance tests[5] in order to determine whether Shepherd was properly handling money orders.[6]  (Tr. at 7-8, 70-71).  Agent Helmers observed Shepherd's handling of the three remittance test money orders via surveillance camera from the administrative area of the lockbox facility while Shepherd was working on the processing floor.  (Id.).  For the first two remittance tests, Agent Helmers put two sham money orders in two different envelopes and observed Shepherd as he operated the "high speed Opex machine," an automated letter opener.  (Tr. at 7).  Shepherd did not see the two money orders.  (Id.).  The third remittance test was conducted in the candling area, in which lockbox personnel used a box of fluorescent lights placed on a table to scan the contents of envelopes to ensure that there were no items therein before shredding the envelope.  (Tr. at 8); see also (Def. Exs. 3 & 6) (photographs depicting the candling table).  Agent Helmers watched Shepherd as he worked in the candling area and saw him identify two items within the envelopes.  (Tr. at 8-9).  For one item, a check, Shepherd notified his supervisor

---

[5] Agent Helmers explained that a remittance test was a procedure by which TIGTA investigators would send a sham payment through the facility and monitor employee handling of the payment.  (Tr. at 7).

[6] One of the items of evidence leading up to the agents' suspecting Shepherd in the theft of money orders was a $1,000 money order made out to "Gregory Ramsey" that was altered on the pay line from "I.R.S." to "Jason Shepherd."  See (Tr. at 17-18).

that he had found the check.  (Tr. at 9).  For the second item, later identified as a blank five hundred-dollar remittance test money order, Agent Helmers saw Shepherd take the money order out of the envelope and push it under the candling light between the table and the light box.  (Tr. at 9, 41).

After Shepherd had completed his check of all envelopes in the candling area, A.J. Dixon ("Dixon"), Shepherd's supervisor, asked Shepherd to come off of the production floor to the administration area.[7]  (Tr. at 9, 41-42, 44-45).  When Shepherd had left the candling area, Bank of America employees Balunek and Sharon Wood retrieved the remittance test money order from where it was hidden underneath the candling light, and brought it back to Agent Helmers.  (Tr. at 10, 41-42).  The agents then went to the office where Shepherd was seated,[8] introduced themselves as TIGTA agents and showed their badges, and told him that they "wanted to speak

---

[7] Agent Helmers asked Mike Balunek ("Balunek"), a Bank of America employee, to escort Shepherd from the floor of the processing area to the administrative area, and Balunek told Dixon to walk Shepherd to a conference room or small office in the administrative area and ask him to wait there.  (Tr. at 11, 44-46). A Bank of America security person searched Shepherd by asking him to remove the contents of his pockets prior to the interview, though this search occurred outside the presence of the agents.  (Tr. at 28, 51).

[8] The office in which Shepherd was seated and in which the interview occurred was approximately eight feet by ten feet wide, with a small desk in the middle of the room, and four chairs—two on each side of the desk.  (Tr. at 12, 73). When the agents arrived in the room, Shepherd was seated in one of  the chairs at the desk on the side facing the door.  (Id.).  The agents took seats directly across from Shepherd, facing him, and between Shepherd and the door.  (Id.).

with him about some things that had occurred [that] morning at the lockbox involving him." (Tr. at 11-12, 54-55, 71). Agent Helmers advised Shepherd that he had the right to remain silent, and the right to counsel, then handed him a TIGTA form titled "Waiver of Right to Remain Silent and of Right to Advice of Counsel," and asked Shepherd to read it. (Tr. at 15, 71, 74). The TIGTA form read as follows:

> Before we ask you any questions, it is my duty to advise you of your rights:
>
> 1.  You have the right to remain silent
> 2.   Anything you say can be used against you in court, or other proceedings.
> 3.  You have the right to consult with an attorney before making any statement or answering any question, and you may have him present with you during the questioning.
> 4.  You may have an attorney appointed by the U.S. Magistrate or the court to represent you if cannot [sic] afford or otherwise obtain one.
> 5.  If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to  stop the questioning for the purpose of consulting a lawyer.
>
> However -
>
> You may waive your right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

(Gov. Ex. 1). The form also included a section entitled "WAIVER" under which the following language appeared:

> I have had the above statement of my rights read and explained to me and fully understanding these rights I waive them freely and voluntarily, without threat or intimidation and without any promise of

5

reward or immunity. I was taken into custody at _____ (time), on _____ (date), and have signed this document at _____ (time), on _____ (date).

(Id.). Shepherd "appeared to read the form," then filled in the four blanks on the form requesting dates and times,[9] and signed his name. (Tr. at 15-16, 56, 74; Gov. Ex. 1).

Prior to asking questions, the agents placed Shepherd under oath by asking him to raise his right hand and swear to tell the truth, and stated that any false statements under oath could be considered perjury. (Tr. at 24, 53-54, 60, 71, 76). After Shepherd swore the oath, the agents began to interview Shepherd, first obtaining his background information, and then questioning him about the money orders. (Tr. at 17, 76-77). Shepherd initially denied stealing money orders, but when confronted with evidence that the agents had watched him secrete the money order in the candling room that morning, as well as with a $1,000 money order made out to "Gregory Ramsey" that was altered on the pay line from "I.R.S." to "Jason Shepherd," Shepherd admitted to intending to steal the money order he hid in the candling room and to stealing approximately ten other money orders. (Tr. at 17-18, 57, 77-79). At the agents' request, Shepherd also provided three pages of hand-

_____

[9] Shepherd filled in that he was "taken into custody" at 9:02 on "Nov 3 2009," and he signed the waiver at the same time and date. (Tr. at 15; Gov. Ex. 1). Agent Helmers testified that Shepherd was "not in custody," but neither Agent Helmers nor Agent Scott informed Shepherd that he was not in custody. (Tr. at 17, 56).

writing exemplars, (Gov. Ex. 2), and a signed, handwritten affidavit in which he confessed to stealing ten money orders,[10] (Gov. Ex. 3).  See also (Tr. at 18-20).  The entire interview lasted approximately two hours, (Tr. at 18, 66), with the writing of the exemplars and affidavit taking approximately another hour, (Tr. at 19, 66).

During the course of the interview, the agents and Shepherd maintained a "conversational" tone. (Tr. at 24-25, 57).  At no time did Shepherd refuse to answer questions, ask to stop the interview, ask for or ask to contact an attorney, try to leave, or otherwise indicate the he did not want to answer questions or continue speaking with the agents. (Tr. at 25-26, 28, 60-61, 88-92).  At no time did the agents tell Shepherd that he was under arrest, that he could not leave, threaten Shepherd, either verbally or physically, and the agents made no promises. (Tr. at 26-27, 89-90, 92).  Though the agents were armed, their firearms were concealed, and were never displayed to Shepherd. (Tr. at 27, 52-53, 90).  Shepherd was not handcuffed or

---

[10] Though Shepherd initially said he did not want to provide an affidavit, after Agent Scott read him a summary of her notes of the interview, Shepherd said that he did want to provide an affidavit. (Tr. at 20-21, 79).  Shepherd did not contest any part of Agent Scott's notes, and in fact said her summary was correct, after which Agent Scott instructed him on how to prepare the affidavit using a TIGTA form. (Tr. at 21-22, 80-83).  Because Shepherd had initially declined to write the affidavit, in order to "ensure that it was shown that it was voluntary," Agent Scott instructed Shepherd to write the statements in the first paragraph of the affidavit that he was providing the information freely and voluntarily. (Tr. at 83, 95-96; Gov. Ex. 3).  Agent Scott also advised Shepherd to strike through and initial areas of the affidavit form that he had not written in. (Tr. at 83-84).

restrained in any way, and though the door to the office in which he was interviewed was closed, it was not locked. (Tr. at 27-28, 91). At the conclusion of the interview, Agent Helmers told Shepherd that he was not being arrested, but that he needed to turn in his identification to Bank of America personnel, and that he could not return to the processing floor that day. (Tr. at 87). The agents concluded their contact with Shepherd that day by escorting him to his vehicle. (Tr. at 87, 99).

## II.  DISCUSSION

Shepherd alleges that the statements he made during the November 3, 2009, interview were not voluntary and were taken in violation of his <u>Miranda</u>[11] rights. "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (internal marks and citation omitted). Because the agents explicitly questioned Shepherd with regard to his suspected criminal conduct with the objective of eliciting incriminating responses, <u>see</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980), the only issues are whether Shepherd was in custody at the time of the interview, and if so, whether he properly waived his <u>Miranda</u> rights and made voluntary statements.[12]

---

[11] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[12] At the conclusion of the evidentiary hearing, Shepherd's counsel mentioned the possibility of raising a claim under <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967), <u>see</u>

A.     **Custody**

"Custody" for purposes of triggering <u>Miranda</u> advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)) (internal marks omitted).  Whether or not a suspect is "in custody prior to his formal arrest depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." <u>Id.</u> (quoting <u>United States v. McDowell</u>, 250 F.3d 1354, 1362 (11th Cir. 2001)) (internal marks omitted).  The standard is objective in that the actual subjective beliefs of the officer and defendant are irrelevant:  custody exists only if a reasonable person under the same set of circumstances would not feel free to leave. <u>Id.</u> (citing <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996)).  The United States Supreme Court has explained:

> [W]hether a suspect is "in custody" is an objective inquiry.  Two
> discrete inquiries are essential to the determination: first, what were the

---

(Tr. at 100-01), but Shepherd has failed to brief or develop any such claim. Accordingly, the issue is deemed abandoned and is not considered herein.  <u>See</u> <u>Brooks v. Ins. House, Inc.</u>, 322 F. App'x 782, 784 n. (11th Cir. 2009) (per curiam) (unpublished) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.") (alteration in original) (internal marks and citation omitted).

circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.  Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave . . . the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.

J.D.B. v. North Carolina, 131 S. Ct. 2394, 2401-02 (2011) (citations and internal marks omitted).

The case of United States v. Muegge, 225 F.3d 1267, 1268-69 (11th Cir. 2000) (per curiam), is particularly instructive given the facts before the Court.  The defendant in Muegge was a civilian employee of the United States Air Force who was ordered by his superiors to report to the Air Force Office of Special Investigations ("OSI"), where he was interviewed by OSI agents in a locked, secure facility.  At all times that he was within the secured area, the defendant was escorted, as was the policy regarding all visitors to the OSI facility, however, he was told by the OSI agents that he was free to leave, came and left the facility on his own, and "left the building twice during the interview for cigarette breaks . . . accompanied by at least one OSI agent, who did not smoke." Id. at 1269, 1271.  The

defendant "was not read *Miranda* warnings before or during the interview. He was given an interview form with a statement of *Miranda* rights, but a line was drawn through the statement with the word 'non-custodial' written on the form by [an OSI agent]. [The defendant] initialed the line in three places." Id. at 1269. During the approximately two and a half hour interview, the defendant made incriminating statements, both verbally, and in a signed, written statement that the OSI agents asked him to write. Id. After analyzing this set of facts, the Muegge court concluded that "[u]nder the totality of the circumstances, an innocent individual in [the defendant's] position who was told he was free to stop answering questions and leave at any time would have actually felt free to do so," and that "[a] reasonable man would not have felt a restraint on his freedom of movement of the 'degree associated with a formal arrest.'" Id. at 1271 (quoting United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) (per curiam)).

In this case, as in Muegge, Shepherd was at work when he was summoned by a superior to sit in a room located within a secure facility where he was questioned by investigators about crimes he was suspected of committing.[13] However, this case

_____

[13] Despite the fact that Shepherd may not have felt that he had a choice in the matter, the fact that Shepherd was summoned to the interview by his superiors while at work is not dispositive. Being ordered to speak with law enforcement by one's employer is not by itself a degree of restraint equivalent to a formal arrest, even where the interview is conducted in a confined room and may result in potential disciplinary action or criminal charges. See United States v. Dudley,

presents a critical factual difference with <u>Muegge</u>, which leads to a different

conclusion on the custody issue.  Similar to the situation in <u>Muegge</u>, Shepherd was

primarily advised of his rights by reading them from a form the interviewing agents

had provided him.  In <u>Muegge</u>, however, the advisement form bore the statement

"non-custodial," written on the form by the interviewing agent, and furthermore the

defendant was verbally advised by the interviewing agents that he was free to leave.

225 F.3d at 1269.  In this case, the form Agent Helmers presented to Shepherd stated

"I was taken into custody" at a blank date and time, which Shepherd filled in, and

signed, and the agents did not tell Shepherd that he was free to go prior to or during

the interview.  (Tr. at 15-16, 56, 74; Gov. Ex. 1).  Though the agents believed that

Shepherd was not in custody, and they did not handcuff him or lock him in the

interview room, display their firearms, or verbally tell him that he was under arrest

---

Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at *1-3 (N.D. Ga. Feb.
3, 2011), adopted by 2011 WL 1060659, at *1 (N.D. Ga. Mar. 24, 2011).  <u>See also United
States v. Mahan</u>, 190 F.3d 416, 422 (6th Cir. 1999) (where defendant was not
advised that he was free to leave, "it is simply of no moment that [the defendant]
had been summoned to the interview by one of his supervisors at work, or that [the
interviewing agent] told him that giving false information during the interview
would be a serious matter[;] . . . [n]either fact even remotely constitutes a restraint
on the freedom of movement to the degree associated with formal arrest."); <u>United
States v. Dockery</u>, 736 F.2d 1232, 1234 (8th Cir. 1984) (en banc) (holding that
defendant was not in custody where she "was directed by her employer to meet
with the agents" and noting that "[o]rdinarily, when people are at work their
freedom to move about has been meaningfully restricted, not by the actions of law
enforcement officials [sic], but by the workers' voluntary obligations to their
employers.") (citation and internal marks omitted).

or could not leave, they waited until the interview was over to tell Shepherd that he was in fact not under arrest and was free to leave.  Under the totality of these circumstances,[14] without some clarification or disclaimer by the agents that he was free to go, a reasonable person reading and signing the form the agents presented to Shepherd would assume that he was either under arrest, or at least not free to terminate the interview and leave; i.e., that he had been "taken into custody," just as the form stated.  See United States v. Harrold, 679 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1338 (where "[u]nder the totality of the circumstances . . . a reasonable person in [defendant's] position would have 'understood [his] freedom of action to have been curtailed to a degree associated with formal arrest,'" defendant was "in custody for the purposes of *Miranda*.") (quoting United States v. Newton, 369 F.3d 659, 671 (2d Cir. 2004)); cf. also United States v. Fred, 322 F. App'x 602, 607 (10th Cir. 2009) (unpublished) (defendant in custody for Miranda purposes where he was interviewed between one and a half to two hours by two FBI agents who wore badges and guns in an enclosed room at the FBI office where defendant was seated with his back to a door he reasonably thought was closed, his wife was

---

[14] Shepherd had been removed from the floor of a secure facility in which he worked, searched by a security agent, asked to wait in a room, and then was confronted by two TIGTA agents who said they "wanted to speak with him about some things that had occurred [that] morning at the lockbox involving him," (Tr. at 11-12), advised him of his rights, asked him to sign a waiver, then had him swear an oath to be truthful under penalty of perjury.

13

not permitted in the interview room, he was told he could leave *"when he was done,"* and the "non-custodial" form he signed was not presented to him until the conclusion of the interview).  Because he never asked to leave, and the agents never told him that he was free to do so, in spite of the lack of handcuffs or a locked door, the most telling piece of information Shepherd had about his custodial status at the time of questioning was from the TIGTA form the agents presented to him which stated that he was in custody, and therefore a reasonable person in Shepherd's position would have believed he was in custody.  Accordingly, the admissibility of Shepherd's subsequent statements during the interview turns on whether he was properly advised of his Miranda rights, and whether he gave a valid waiver of those rights prior to making statements in response to questioning.

## B.    Advisement and Waiver

The government bears the burden of proving by a preponderance of evidence that a defendant validly waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997).  See also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  Prior to the initiation of questioning, law enforcement agents must fully advise a defendant in custody of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."   Miranda 384 U.S. at 467-70

14

(acknowledging that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely"); see also J.D.B., 131 S. Ct. at 2401("Prior to questioning, a suspect must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.") (citation and internal marks omitted).  Miranda further requires that law enforcement respect the defendant's decision to exercise his rights as outlined in the warnings. 384 U.S. at 473-74. ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444; J.D.B. 131 S. Ct. at 2401.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

Whether a waiver of Miranda rights is voluntary "depends on the totality of the circumstances and must be evaluated on a case-by-case basis." United States v. Vanbrackle, 397 F. App'x 557, 562 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted). "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3. "Among the factors [the Court] consider[s] are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Vanbrackle, 397 F. App'x at 562 (citation and internal marks omitted). However, a signed, written waiver of Miranda rights is strong proof of the validity of the waiver. Id.; United States v. Stephens, 202 F. Supp. 2d

16

1361, 1370 (N.D. Ga. 2002).  To find a waiver involuntary, "coercive police activity is a necessary predicate."  Connelly, 479 U.S. at 167.

Here, Shepherd signed a written waiver of his Miranda rights after Agent Helmers verbally advised him that he had the right to remain silent as well as the right to counsel, and after he was given an opportunity to read the TIGTA form. Based on his ability to speak with the agents and write his own affidavit, Shepherd seemed to be of at least average intelligence and guile, and able to read and write English.  The form the agents provided adequately stated all of the rights required under Miranda, and clearly stated that the individual signing the form had been informed of those rights, fully understood them, and freely and voluntarily waived them.  See (Gov. Ex. 1).  The agents watched Shepherd read the form before signing and dating it in the proper areas, and he then answered the agents' questions without objecting, asking for an attorney, or asking to leave or discontinue the interview.[15]

_____

[15]Shepherd argues that the government has not proven that Shepherd actually read the form presented to him, and the government has not proven that either agent adequately verbally informed him of his rights.  See [Doc. 27 at 18].  However, both agents testified that Agent Helmers advised Shepherd that he had the right to remain silent and the right to counsel before handing him the TIGTA form and asking Shepherd to read it.  (Tr. at 15, 71, 74).  Combined with the government's submission of the signed Miranda form and waiver, (Gov. Ex. 1), this testimony is sufficient to carry the government's burden that Shepherd was adequately informed of his Miranda rights, even if neither agent testified as to the exact words that Agent Helmers said to Shepherd.  See United States v. Cole, Criminal Case No.

17

Before Shepherd signed the waiver, the agents did not engage in any impermissibly coercive conduct, had not detained Shepherd for a great length of time,[16] and did not physically threaten him, display their weapons, or make any promises or inducements.   Furthermore, Shepherd wrote out a waiver in the first paragraph of his affidavit, stating "I was adviced [sic] of my right to remain silent and the right to adivce of concel [sic]. I waive these rights and agreed to be interviewed.   I provided the information during the interview and this written statement voluntarily without threat or promise of reward."   (Gov. Ex. 3).   Agent Scott testified that she told Shepherd to write this waiver after he changed his mind

---

1:09-CR-412-ODE-RGV, 2010 WL 3211027, at *24 (N.D. Ga. May 12, 2010), adopted by 2010 WL 3210963, at *1 (N.D. Ga. Aug. 11, 2010). See also United States v. Collins, 40 F.3d 95, 98 (5th Cir. 1994) (written Miranda advisement presented on form sufficient where government showed that defendant read and understood the form); United States v. Osterburg, 423 F.2d 704 (9th Cir. 1970) (same); United States v. Bailey, 468 F.2d 652, 659-60 (5th Cir. 1972).   Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).   Moreover, if the Court were to find that Shepherd did not read the form as he argues, then he could not have read the critical phrase printed thereon stating that he was "taken into custody," as discussed supra.   Since the finding that he was in custody for Miranda purposes turns on Shepherd's reading of this phrase, if he did not read the form, he could not have reasonably believed that he was in custody since he was not subject to any restraint, coercion, or force. See Muegge, 225 F.3d at 1271; Dudley, 2011 WL 1100607, at *1-3.

[16] The entire contact with Shepherd lasted only from approximately 8:30 am until noon, and Shepherd signed the waiver shortly after 9:00 am. See (Tr. at 18-20, 66; Gov. Ex. 1)

about writing an affidavit.  (Tr. at 83).  Shepherd's signature on the waiver form, his written statement, and the fact that he exercised free choice to change his mind with regards to writing the affidavit show that he knowingly, intelligently, and voluntarily chose to answer questions and write the affidavit.  Shepherd was therefore properly informed of his <u>Miranda</u> rights prior to questioning, and properly waived those rights before making statements or writing his affidavit.

**C.    Voluntariness of statements**

Aside from the mandates of <u>Miranda</u>, whether a statement was voluntarily given must be examined in light of the totality of the circumstances.  <u>See</u> <u>Schneckloth</u>, 412 U.S. at 226; <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003). This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice."  <u>Schneckloth</u>, 412 U.S. at 225; <u>Hubbard</u>, 317 F.3d at 1252.  Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police.  <u>See</u>, <u>e.g.</u>, <u>Schneckloth</u>, 412 U.S. at 226; <u>Hubbard</u>, 317 F.3d at 1253.

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement:  "[T]he relinquishment of the right

19

must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. Those cases where courts have found confessions to be involuntary "have contained a substantial element of coercive police conduct." Connelly, 479 U.S. at 164. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted).

In this case, all of the factors point in the direction of voluntariness. Shepherd was only interrogated for approximately two hours, which is a reasonable amount of time. See Martin v. Wainwright, 770 F.2d 918, 927 (11th Cir. 1985), modified on other grounds, 781 F.2d 185, (11th Cir. 1986) (no coercion in spite of 5 hours of interrogation). As discussed, there is no evidence that the agents threatened Shepherd in any manner, or otherwise applied force to him during the interrogation. In fact, Shepherd was not handcuffed or restrained at the time of the interview. There is also no evidence that the officers made any promises or inducements to obtain Shepherd's statements. During the interrogation, Shepherd never showed a desire to end the questioning, never asked for counsel, and never indicated that he did not understand the questions he was being asked. There is also no evidence that

20

Shepherd's mental or physical status at the time of the interrogation resulted in any misunderstanding of his rights.  Considering the totality of the circumstances, there is no basis for concluding that the entire sequence of events brought about an involuntary confession.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Shepherd's motion to suppress statements, [Doc. 15], be **DENIED.**  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 22nd day of August, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

21